Thank you. Good morning and may it please the court. My name is Ari Stiller on behalf of Melanie Sportsman and I'd like to reserve two minutes for rebuttal. California has made it hard to properly classify workers as independent contractors. The traditional test focused mainly on control and the right to control. But California regulations and now Assembly Bill 5 added two additional criteria to the harder to classify workers as independent contractors. And those two criteria are prongs B and C of Dynamex's ABC test. Whether the worker works outside of the hiring entity's usual course of business and whether the worker operates her own independent business. The point in adding these criteria was to prevent businesses including those in the gig economy from displacing traditional businesses that hire employees to perform their work. Now we can debate the policy behind California's regulations, but California is a sovereign state and it has the power to regulate the public welfare within its borders. That's not an issue of course. The key to this case it seems to me is criterion B in the ABC test and that is whether the worker works outside of the usual course of the hiring entity's business. Could you explain your position on that point and why, in your view, a place for Rover is in the same business as she is? Absolutely. Rover's main point on prong B is that it's simply operating a marketplace or a forum where independent providers can connect with pet owners to provide services. But Rover's business actually did much more than that. And Rover took a much heavier hand in a way that distinguishes it from a true open marketplace. This court actually outlined in Vasquez a couple of different factors that other courts have used to determine whether the hiring entity is in the same business. And that's whether the work is incidental to the client. Whether the client still relies on continuous services by the, in this case, pet care provider, and also whether the business, whether the potential employer holds itself out as operating in that line of business, the same line of business as whether the service is done. And here from the very beginning, Rover took a very heavy hand in how the pet care services would be provided. For example, they only approved 20% of sitter applicants. So they were very selective as far as who could offer the services in the first place. And they next required for weekly dog walking and other regular services, they required the pet care providers to use a Rover card to give pet owners very specific details about the pet services that were being provided. Like if a dog went to the bathroom or where which route was taken on for that for that regular service for the for a walker or whatever, a regular service. But all these things you're you're talking about kind of seem to be going back to the prong a the sort of the old fashion control. And I think I don't think I didn't understand you to be arguing that there was, you know, that necessarily prong a doesn't seem to be your strongest argument. It seems to me as as as Fletcher was saying, prong B seems to be your strongest argument. And that seems to be, if we understand that what prong B is basically getting at is that if you run a restaurant, and you're hiring an electrician or a plumber, you know, come in and do some work, right, like because your Then that seems to be what that what the way prong B's articulate, it's not in your ordinary line of work. And we're not going to say that the electrician is an employee because they only show up when you have a have a short. And under that, if that really is the test, and I think prong B helps you a lot. But I maybe it's just maybe it's just because, you know, we're all sort of, we all see control as sort of and we're all used to control being sort of the thing that you look at. And California is out of this other thing. But I want to ask you, so are you familiar with Etsy? Are you? I'm personally just somewhat familiar with it. But I can't represent the how the business really operates. And I don't see sells crafty things, right? Etsy sells crafty things. And the thing I'm struggling with is it seems like prong B almost comes down to, it's easy to feel like something is a product, right? And Etsy kind of kind of is in both worlds, because Etsy sells personalized products. So you buy a cutting board, but you can get your name engraved on it, right? So that involves some labor. Rover is a service, they're mostly selling service, it's not a product, right? Rovers, a marketplace for services, I think would be a good way to, but does your does prong B does it doesn't matter that it's like, is there some under California law? Is it if they're doing if it's a basically, you're going to be an employee. But if it's a marketplace for products, like Amazon is kind of the quintessential example, but Etsy is kind of Etsy kind of, kind of is on both sides of that. I'm just trying to figure out it's it's prong B does seem to favor you as long as we are in that paradigm of only like the electrician or the plumbers coming in. But that boy, that seems that seems pretty extreme. But maybe that's where California is. Well, um, I thank you for that question. I'd like to make a few points on that. First of all, businesses like Etsy, they're the California exempted a lot of different types of businesses from the ABC test. So it's not it's not quite so simple to say that every business is automatically subject to ABC, such as Etsy. And therefore, every potential marketplace is going to fall under that test. California made some very specific exemptions, like a personal services exemption, a business to business exemption. And in the people versus Uber case, when Uber is that he exempted, I don't I don't know, is that he's, isn't it? I don't know enough about it. He's business model to know whether it would fall within those exemptions. But Cal, but my point is that California has made the choice where it did see a potential difficulty or maybe as you say, the law shouldn't be applied to a particular type of Now, Rover here only argued for the referral agency exemption, which the district court rejected application of that exemption. So Rover could have structured itself as a true referral agency, but it chose not to operate its business that way, which brings it within the ABC test. How could it have structured in your view? How could it have structured itself as a as a referral as a referral agency that would mean it wasn't subject to ABC? Well, there are 11 criteria for the referral agency exemption. So some of them, for example, they, the referral agency exemption requires the business not to make any deduction from the pay from the from the earnings of the service provider. And here it's it's undisputed that Rover deducts 20% of Miss sportsman's earnings. And that was the way that it that it made its money. And that's also relevant to be as well. Because it is and this court actually found that that pay structure to also be relevant to be under Vasquez. Because when I'm familiar with, I think we're all familiar. But in your view, it does seem a little odd. Because in your view, like if they just done it a tiny bit different in the sense of saying, how much do you want to take home $30? Okay, we'll add 20% on top of 30. That would have been okay. But because they said, how much do you want to charge $36? And then they and then they let them take home 30. Boy, that seems kind of kind of superficial. But you're saying that makes a difference. The legislative history does show that there's a difference there. And Rover called what it was doing. You don't think it makes a difference that they that they they kind of do the math for you, as I understand it, like they go in there and they say, this is how much you'll take home. If you pick whatever number you pick, you don't think that that makes a difference there. I don't, the legislature was very clear that that is what Rover's argument is, as far as being able to calculate the math is that it's no longer a deduction, even though we call it a deduction, and it's deducted. It's not a deduction, because you can potentially, you know, yourself, you can choose to offset the deduction. But offsetting the deduction doesn't change it. So that's no longer a deduction. The statute is pretty clear on on that. Would your argument be that it would be a deduction even under the other circumstance I was talking about, where like, where they said, how much do you want to take home? $30? Okay, so we'll set it at $36. Wouldn't you kind of, you'd still be arguing that was a deduction, wouldn't you? Yes, if, if the if the rate, if Rover increased the rate, and then deducted, that would, I guess that would be a little bit of a closer call, because Rover, Rover increases the rate, and then still deducts from the earnings. That that's getting closer to the example in the legislative history, which is unlike our situation, where Rover actually took a percentage of the rate that Ms. Sportsman said. If we're still talking about whether or not this is a referral agency, as you point out in your brief, there are 11 criterion, all of which have to be satisfied. And here, we're only talking about one, you say that she, that Rover doesn't satisfy four of them. One of them, for example, is that the service provider, that is to say, Sportsman, has to be delivering the services under her own name, which she's not doing. I mean, I think it's a, it's a given that this is not a referral agency. That's a helpful point, because the court doesn't even need to go there as far as the deduction prong, since this is summary judgment, and there are clearly disputed facts about whether Ms. Sportsman has to be delivering the services under Rover's name. I'm not even sure how disputed that was. Yeah, I mean, she was, she was, Rover gave her Rover branded business cards, a Rover phone line, and she was vetted by Rover. And, and those are also points, again, that are relevant to prong B and, and Judge Van Dyke, as far as your initial question of whether the points that I was mentioning earlier are more relevant to control. In fact, the fact that Rover required providers to have to, to, to fill out these Rover cards for weekly services, for example, and, and how selective they were, and the fact that they issued Ms. Sportsman a phone line, these distinguish Rover's business from an open marketplace, which is why it says it's not subject to prong B, because it says all it's operating is an open marketplace. But in fact, it did. Counsel, so earlier you said open marketplace and, and I thought then, but I didn't want to interrupt you. But like, I don't know that the idea, I don't know if they're arguing this is an open and set in a sense of like a totally free laissez-faire marketplace. I mean, the whole point of somebody like Rover doing what they are doing is to put constraints on the marketplace so that the service that's provided is, is top notch. I mean, people do this in every, you know, that that's the, that's the value that Rover in theory adds. So I don't, I mean, this open marketplace, does it need, does it need to be a purely open marketplace? Or I'm trying to figure out where you're getting that from? Well, what I'm what I'm getting at is that Rover's usual business is dependent on the services provided by the dogwalkers. And because of that incentive, Rover takes a heavy hand in doing things beyond operating, whether you want to call it an open marketplace or a true marketplace, because Rover actually has all of these additional either requirements or suggestions where it gets involved in how the work is would. And, and then the third, I'm sorry, I didn't, I didn't answer your question. I would briefly go ahead. I'm sorry. I have a slightly different question. Does the record reflect whether Rover receives income from any other source other than the, the charge that comes off of the off of matching walkers and, and clients? To my knowledge, the record reflects that Rover's income solely comes from that 20% that it deducts. We're not getting we're not getting anything by from advertising traffic that from people going to the website, matching up and all of a sudden seeing that they can buy dog food. Right, I'm and I'm happy to answer that question. I do see that I'm, oh, I'm sorry, my my, I think it was set down to 13 minutes. So I think I'm okay on my time here. Yes. The correct correct, unlike other marketplaces. So it's your argument is this is more like like Uber and Lyft. In that they're entirely dependent on income being generated by people like this sportsman. Yes, exactly. It's very hard to distinguish this case from Uber and Lyft, where the court held that what Uber was really doing when you look at the substance of its business is selling rides and Uber had an identical pay structure. The court actually did not when it denied summary judgment in Uber versus in O'Connor versus Uber said that Uber pays its drivers 80% of the fare that it charges the rider while keeping the remaining 20% of the fare. And so even if Rover was earning some some other amounts, the fact that it, the fact that it has that deduction structure shows that it's in, it's in the business of providing dog care services and selling dog care services, more than simply operating a marketplace. And we're down, we're down about 30 seconds. Council. Do you have any more questions? Not at this point. Okay, why don't we save that 30 seconds and, and we'll hear from the other side. Thank you. Good morning, Your Honors. May it please the court. My name is John Leckrone, and I represent Apelli in this action, a place for Rover. In its simplest terms, Your Honors, Rover is an online marketplace. We've been talking about marketplaces for the last few minutes, but it's an online marketplace, an electronic platform that is designed to help facilitate pet owners and pet service providers. So Council, I think I agree with you that it's an online marketplace. I'm not sure it matters how open it is. But the problem I'm having is, is with prong B, at least at the ABC test, because it seems like California wanted to bake something that is an online marketplace, maybe even Etsy, into an employer. And it seems like that's what they wanted to do. And my mind keeps wanting to go back to control. And I think you have good arguments on control. But part B seems like it's basically saying, if you're, if you're calling in an electrician or a plumber, you know, they're not going to, we're not going to say they're an employee. But if they're in the same business, and so if you try to say, well, this is a marketplace, you know, and they're somehow below that, or so, you know, the walkers are somehow below that. It seems like prong B is, you know, they were trying to take businesses that try to separate vertically and make them employers, not independent contractors. What Appellant appears to be arguing, Your Honor, is that it is a right line marker between services and products and how they are sold on the on an online marketplace. And I don't think there's any distinction between how they are sold, or who controls the the proper sale of those, those services or those, those products. I just, you know, the Vasquez test sets out three part tests. You know, I think I would prefer actually that you tell me how your case compares to Uber. I mean, Vasquez is us. This is a question of California law. I'm looking at people versus Uber technology decided by California Court of Appeal. It strikes me that as that court decides whether or not Uber and Lyft qualify under prong B, your business looks an awful lot like the business of Uber and Lyft. And let me explain some key distinctions. I think the Uber scenario is pricing. Uber and Lyft, I'm sorry, pricing, they set the pricing. If Rover were in the business of dog walking, and dog sitting, it would be setting the prices if that was their business. They don't do that. They allow the pet care providers to set whatever price they want to set. Do they have any recommendations as to how prices should be set? I'm not sure I would qualify that as a recommendation. But there are suggestions about how to do it. And they're very clear up front with every single pet care provider, that there is a 20% fee. We charge a fee, Rover charges a fee to advertise and use the website. So they are told that in advance. And it's 20% of the fee charged by the dog walker. Right. And we put on the in this record is a calculator. And it's an online calculator. It explains to them. No, I understand that. That's a fee that is directed to the provider and not to the pet owner. Correct. And in the legislative history, that is already before this court, the concern about the exemption issue was putting on the shoulders of the pet care providers having to pay the fee that fee is paid by the owners. And it is in advance, it is told to the pet care providers when they set their own fee. Right. And the fee is then paid to Rover. Rover then remits 80% of the fee that was paid to Rover. Correct? Correct. Yeah. So what about all these other things that Rover does to ensure the quality of the service that is provided? For example, they've got a screening process, only 15 to 20% of the people who originally apply make it through the screening process, maybe some of them drop out voluntarily, but they police, as it were, the quality of care that's being provided. And they do various other things to supervise. They're not just sort of an inanimate bulletin board. That's true, Your Honor. But the record reflects here that there is no screening process per se. There is a process under which you mean by no screening process per se. That's an interesting phrase. I would say that the one part that may be a screening process is that term, as I understand that term, would be the background check issue. Other than that, I'm unaware of anything in this record that says we screen pet care providers. They sign up, they create an account, they're providing... Does the record reflect that sometimes people apply and are rejected? Nothing in this record, certainly nothing that I have seen, says that. So how do we know then how we move from X number of people who apply and only 15 to 20% finally are licensed or approved? It could be for any number of reasons, Your Honor. It could be that they don't finish the application process. Are you contending that Rover doesn't care what these people are like? Maybe you're saying the background check is run by them because they do care. Indeed, they do care, Your Honor. It sounds as though they have some control over who's doing this. Well, the background check is something that ensures the integrity of this website and also ensures the safety of pet owners. So they're not just an inanimate bullet board in that sense. They do screen. If they can't pass the background check, they're not allowed to do this. Yes, Your Honor. And there are various other things that they do. It strikes me I'm still having trouble seeing how they're different from Uber, except for the fact that the dog walker gets to set the price out of which the 20% will be taken. Is there any other material difference? The Uber drivers don't set profiles on the website. They don't advertise on the website like pet care providers do. Drivers don't set their own pricing. They also don't. Yeah, excuse me. You said that already. Okay. And the drivers like or the riders, such as any one of us who select Uber, go on to Uber to get a ride, we don't get to that's all done by Rover. And so that's why Rover sets the prices. It selects the drivers. It tells the drivers where to go, how to do it, what length of the ride is going to be. Rover is quite a bit different, Your Honor. This record, you know, it's undisputed that Rover allows their pet care providers to set their own rates, to set their own timing, their geographical locations, how many dogs they will be willing to babysit or not babysit, what types of dogs they will babysit or not. So counsel, you've got a couple of different ways that Rover advertises, and it appears to me that there's sort of two sides to this. One is that Rover is trying to acquire service providers and there it advertises that it's a marketplace. This is a place where you can come and use us and we'll get you out there. On the other hand, Rover also conducted a campaign in which it branded itself as the dog people. Now, that's not just trying to attract people like sportsmen just because she likes dogs. That appears to be an appeal to the public. So if they are the dog people, why isn't that similar to Uber or Lyft being the ride people, the alternative to the taxi people? Your Honors, I would go back to the way in which the business is run. Uber. I understand that, but if they're holding themselves out as the dog people, now that may have been an ill thought through campaign in light of their business model, at least once we get to the question as to whether these folks are employees. But they did hold themselves out to the public, that is to the pet owning public, as the dog people. But I think, as pointed out by Judge Oreck in his order, that is just one phrase, one marketing phrase. It does not say or state or frankly even suggest that we are in the business of walking dogs or dog sitting. In fact, we say in our terms of service and we say it to everyone that uses this service, we are not in the business of dog walking. I ask this question, Mr. Stiller, and I want to ask you the same question. Does Rover, what does the record say about Rover's sources of income? Does it receive income from any source other than the fees that are remitted from its service providers? The fees, the 20 percent fee is paid by it or is it right? Does Rover have any other source of income other than those fees? In this record, there is a small fee that the pet owner pays. I believe it covers some layer of taxes, sales taxes or things of that nature. But that's all. But it's all wrapped up into the fee. It's all wrapped up. So we're not getting we're not getting we're not getting advertising from from people being driven to the from people being driven to the website. That is a dog owner. Correct. Does it goes to the website is going to see a lot of advertising for dog food. And and Rover is receiving income from that. So Rover's sole income depends on people like Miss Sportsman. Its sole income depends on people advertising on its website. Well, not just advertising on its website, not getting anything from the advertising, it's only getting it's only it's only when there's a sale is completed. Correct, Your Honor. The website, however, is being used by the pet care providers to advertise their services. Sure. OK, but counsel, I think you've really confused the issue now. I think you've confused the question. So I'm going to go back and ask the questions again. So when I when I talked about sources of income and asked about advertising, what I was asking was whether there was any source of income to Rover from advertising that's running on the website. That is like a dog food company might say, hey, these are we're going to have dog owners going to this website. I'm going to try and sell my dog food here. And Rover might be getting income from any from driving traffic to its website. Your answer to that was no, but there's no income from that advertising. Now, if Miss if Miss Sportsman advertises on Rover, is she paying them any kind of a fee? To advertise for advertising is the profile, right, but there's but if she doesn't accept any jobs, she's not they're not getting any money from her, right? They're not getting any money from the advertising, only from a successful transaction. That's correct. OK, so unlike the old fashioned yellow pages where you put an ad and you paid a flat fee for that ad, this is much like that. But this is the more modern version of a yellow page. So, counsel, let me so I had thought about this, but I don't I don't remember seeing anywhere that California's got a lot of requirements since ABC test. But I remember seeing anywhere that that you it makes you less of a employer if you've got a very diversified marketplace versus so like, you know, because I thought about it with Etsy, I keep coming back to Etsy, but Etsy sells a lot of different things, right? Rover sells just five different kinds of services. It seems like, you know, if you know, under your view, it's a marketplace for five different kinds of services, whereas Etsy has is a whole bunch of different stuff. But I don't think the California test necessarily turns on the fact that you do, you know, 14 different things versus one different thing. Is that is there a part of the test that and maybe I should be asking your opposing counsel that, but is there a part of the test that we're having a diversified marketplace makes you more likely to not be an employer? I'm not aware of anything in the record that would say that one way or the other, Your Honor. Yeah, so this is what I'm struggling with. Like, I don't almost all these things that we have in California law that talk, you know, that say they're getting all their income or if they were to lose these people, they would lose their, you know, you know, this is the lifeblood of their business or something that could all be true of a marketplace, I think. So I don't I don't see how any of those things are very helpful. Maybe they're maybe they're the law, but they're not very helpful in distinguishing a true marketplace from an employer. Almost all of this stuff that we've been talking, but what I'm really struggling with is that Prom B, because Prom B seems to be set up to basically make it very hard to to stratify vertically a to stratify vertically and say, well, we're going to provide this one part, you know, the marketplace, etc. And they're going to provide the actual service. And that makes sense to me that you could do that. And you could divide the world up that way. But California seems to be trying to make it very hard to divide the world up that way. So that's the thing I'm really struggling with. Why? I mean, your your argument is, yeah, but we're different. We're a marketplace and they're pet walkers. And that's not a crazy distinction. But how does your how does your argument not end up meaning that Prom B is basically kind of meaningless? Your Honor, the marketplace, as we've been calling it, is just an electronic marketplace. It connects pet care providers who want to advertise and market their services to the people, their customers, who are who are pet owners. You think Uber? Let me ask you this. This may be helpful, because I actually do think that there's a big difference between Rover and Uber as far as control for the reasons that you say in your brief and you said this morning, you know, they don't they get to set their own price here, etc. Like that's a big deal. But do you think Uber on Prom B is distinguishable? Or do you think Uber on Prom B would also be Uber would be the marketplace and the folks would be the driver and they would not drivers and they would not be they would that Uber would be able to meet Prom B? Your Honor, just for some clarity is the question whether I think Uber would reach Prom B? Yeah, would would Uber be able to prevail on Prom B such that it would meet the ABC test? Would Uber win on Prom B? I would go back to my original point. Uber sets all of its prices. It picks the drivers. It there is no advertising on its website per se. The drivers don't advertise. I can't pick those drivers. All that goes to control. That's not really like I mean, that's all A, it seems to me. Yes, Your Honor. And I also think it goes to B because I do think it it says they are in the business of driving people, of picking people up and dropping them off. And they're controlling all of that process. Uber or Rover controls none of it, Your Honor. They provide no control. Well, they control some of that. I mean, I think my colleagues have been getting at the fact that they control some of it. But I'm not troubled by that because you can because you know, a good market person. I think the answer to Judge Van Dyke's question is that the California Court of Appeal and Uber held that Uber failed to satisfy Part B. I'm just reading it from I'm just now reading from that opinion, the facts aptly support the conclusion that whether or not drivers purchase from defendants, they perform services for them in the usual course of defendant's business. Yes. I mean, I think I think we know what Uber does or doesn't do with respect to Plan B. Right. And I think that distinction is an important one. I think what they do in their business is controlling and monitoring and doing that. They're in that business. No, no, I understand that. But I understand that. But I thought the question from Judge Van Dyke was, does Uber satisfy Plan B and the Uber case from the California Court of Appeals under Part B? And so to be clear, what I agree with that, you're right. Yeah. And so to be clear, what I'm saying, I can see how to distinguish Rover from Uber on Prong A, because I do think there's significant difference on the amount of control. I'm having more of a struggle trying to distinguish Rover from Uber on Prong B, because it seems to me that the rationale is that they just don't want you to be able to vertically they want they don't want you to be able to slice something vertically. And so that's my concern. And that's what I'm having a lot of trouble with. Two points. And I realize I'm out of time. Go ahead. The first point in response to your question, Your Honor, is if Uber were in this business, Uber would be setting the prices. All it is doing is allowing the seller, Rover, I'm sorry. I keep, I apologize. Rover is just putting these two individuals or these two people in touch with each other. They connect and they do whatever deal they want to do. They reach whatever agreement they want to reach. We control no aspect of that. We are not in that business. Number one. Number two, if you look at the Vasquez factor, number two, factor number two, which is whether the pet care providers continuously perform for Rover. I think this panel has already pointed out that some of these pet care providers don't perform at all. So, Counselor, I remember that's your argument. But I sort of read that as getting at the electrician slash plumber thing where, you know, an electrician doesn't continuously perform for a restaurant. Electrician just shows up, you know, whenever they have a short or a plumber, whenever they have plumbing problems. And so that's kind of what I thought Vasquez was talking about. I didn't think they were saying, well, there's each individual person continuously perform. So I actually kind of think that that one works against you. That's the problem, Evan. But it sounds like your time is up. I guess I'll give you 30 seconds to sum up if unless my colleagues have more questions. Well, I thank you for your time, Your Honor. I do think the sum total here at its end result is that Rover is nothing more than this marketplace. I know we keep talking about that, but we do. We are just putting, connecting pet care providers with pet owners so they can reach whatever agreement they believe is appropriate to care for their pets. And that's all we're doing. We're not dictating any portion or part of that process and that connection. And as I said earlier, we are not in the business of providing pet care services. The record here is undisputed in that regard, other than perhaps providing a marketplace. But I just don't think that rises to the level of providing the services that are required under part prong B of the test. Thank you, counsel. We appreciate you being willing to go over a little bit. Thank you. For your opposing counsel, we took your opposing counsel over a few minutes, so we'll give you two minutes. We'll put two minutes on the clock and you can go ahead and start. Thank you very much. First of all, I'd like to provide a citation to Judge about the sources of income and whether Rover relies on other sources of income. Their PMK testified, quote, if there were no transactions between the sitter and owner, there would be no revenue for Rover to collect. So clearly it's reliant on that type of transaction happening. Counsel, I thought this is what I was getting at earlier. That seems to me to be a kind of a silly, maybe I'm forbound by that, but it seems to me to be a silly rationale. That's true of like myriad marketplaces, right? True marketplaces. If you've got a marketplace where they sell nuts and bolts and they have 14 little tiny companies that work in there selling different kinds of nuts and bolts, if there are 14 little companies left, then they'd be out of business. The marketplace itself would be out of business. So that's just kind of, I never understood why that rationale, that's true of customers. If you said, you know, if I'm selling cups of coffee, right? Certainly the people buying the cups of coffee aren't employees, but if people stop buying coffee from me, I'm out of business because I depend solely on that. I understand the point, but this court has held that it's relevant to problem B because, for example, in Jampro, the court held that Jampro is not indifferent to how much work the unit franchises do or how well they perform that work. But no company is indifferent to its customers either. It doesn't distinguish customers from suppliers, from employees, from independent contractors. It's a completely useless test. I mean, you can, it doesn't, like economically, it's silly, but. I understand. Thank you. I do want to provide the citation to that quote, though. It's 8 ER 1510. Also, the record citation that that Rover only accepts 20% of the Sitter applicants is at 8 ER 1494. It's actually an interview that the CEO gave where he touted the fact that Rover is so selective when he was trying to show that the business really, it's only going to, it's only going to give dog owners the Rover experience. So can I ask a question to follow up on Judge Bybee's, or I'm sorry, Judge Fletcher's question to your opposing counsel, which is, do we know, is that just because they sort of get, is it possible that's because they get, they lose 80% through sort of attrition because it's a challenging application process, or do we know that there are people that want to go forward ? I think if they, if they fail the background check, it sounds like we know that they're out, but short of failing the background check, do we know whether there, there are people that want to go forward, but, but they're just saying, no, you can't go forward. Well, that's certainly the impression that the CEO gave to Jim Kramer when he did that interview. And that's in the record that Rover is actually being selective. And that was a good thing. Dog owners should want whoever's providing their pet care services to be vetted. And, and so because especially we're on summary judgment and inferences should be drawn in sportsman's favor. If you do look at that, then you can easily see he was, he was trying to say that Rover is selective and it's, it is not just screening people out based on a, you know, criminal background check, but actually weeding out people who might not be good dog care providers. I just like to make a few more points because I know that my time is limited. The, the point about prices, that's, that is one distinction between our case and Uber, and we, we grant that in Uber, Uber selected the prices and here the, the dog, the pet sitters and care providers had more control over prices, but Uber did not turn on the fact that Uber set prices. If you read Uber, what it, there are actually many, many similarities. And what it came down to was the fact that Uber is selling rides and profiting from the sale of rides, Uber and Lyft, the court held both solicit riders and they screened drivers. And the court found that Uber's usual course of business was to provide rides. And so, so you, the, the pricing is a, it's a distinction without a difference because ultimately what was critical to Uber was the fact that Uber was selling rides and it was using the drivers to, to sell those rides. That's how it ran into business. And also, I think we're about two minutes over the two minutes I gave you. That's fine. I'll give you another 30 seconds to sum up. I, you know, I can, I can really leave it at that. I, I think we've pointed out that Uber did not, obviously that Rover, I'll, I'll do it too, that Rover did not operate simply a marketplace. It's hardly distinguishable at all from Uber and Lyft, and it falls squarely within the holdings of those other cases. And if there are no further questions, I can leave it at that. Thank you for your time. Thank you to counsel from, from both sides. There's obviously a lively question to answer. We appreciate your answers. It's helpful. And this case too will be submitted as of today, which we'll be moving on to our last case of the day.
judges: FLETCHER, BYBEE, VANDYKE